## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### CASE NO. _____

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE AND CASUALTY COMPANY,

      Plaintiffs,

        vs.

FIRST CHOICE CARE CHIROPRACTIC &
REHABILITATION CENTER, INC., a Florida
Corporation, INTERNATIONAL
CHIROPRACTIC AND REHAB, INC., a
Florida Corporation, JEAN HARRY
MAURICE, an individual, FAUSTIN
BELIZOR, an individual, and DIANE
COPELAND, D.C., an individual,

      Defendants.

_____/

## PLAINTIFF'S COMPLAINT

Plaintiffs, State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively referred to as "State Farm Plaintiffs" or "Plaintiffs") bring this complaint against First Choice Care Chiropractic & Rehabilitation Center, Inc. ("First Choice"), International Chiropractic and Rehab, Inc. ("International"), Jean Harry Maurice ("Maurice"), an individual, Faustin Belizor ("Belizor"), an individual, and Diane Copeland, D.C., an individual ("Dr. Copeland") (collectively, "Defendants"), and state as follows:

1

45937856;3

**Nature of the Case**

1.     The claims in this case arise out of Defendants' unlawful scheme to circumvent Florida's mandatory health care clinic licensure requirements and to avoid oversight by the Florida Agency for Health Care Administration ("AHCA").

2.     Defendants' scheme evaded the licensure requirements under Florida law by misrepresenting that First Choice and International (collectively, the "Clinics") were owned and operated by a licensed health care practitioner, Diane Copeland, D.C., to give the appearance the Clinics qualified for a licensure exemption when, in fact, the clinics were owned and operated by unlicensed lay persons in violation of Florida's Health Care Clinic Act (§ 400.990) ("Clinic Act").

3.     As a result of their fraudulent scheme, the Clinics operated in violation of Florida law and unlawfully obtained insurance benefits payments from Plaintiffs in excess of $734,000.

4.     State Farm Mutual and State Farm Fire seek to recover their payments to the Clinics through a claim for unjust enrichment.  Plaintiffs also seek a declaratory judgment confirming neither State Farm Mutual nor State Farm Fire is obligated to pay any of First Choice's or International's unpaid bills, invoices or demands.

**Jurisdiction and Venue**

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

45937856;3

6.      In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district and Defendants reside and/or do business in this judicial district.

## The Parties

8.      Plaintiff State Farm Mutual Automobile Insurance Company is an Illinois domestic property and casualty insurer incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual Automobile Insurance Company is registered to conduct in business in the State of Florida as a foreign corporation, and has conducted and is doing business in Orange County, Florida.

9.      Plaintiff State Farm Fire and Casualty Company is an Illinois corporation with its principal place of business in Bloomington, Illinois.  State Farm Fire and Casualty Company is registered to conduct in business in the State of Florida as a foreign corporation, and has conducted and is doing business in Orange County, Florida.

10.     Both State Farm Mutual and State Farm Fire issue automobile insurance policies in Florida and have made substantial insurance benefits payments to or for the benefit of First Choice and International.

11.     Defendant First Choice is a Florida corporation that operates as a health care clinic providing chiropractic treatments to individuals involved in automobile accidents.  It was incorporated on September 20, 2006 with its principal place of business at

45937856;3

incorporation through the present being at 1080 Havendale Blvd NW, Winter Haven, Florida 33881.

12.    Defendant International is a Florida corporation that operates as a health care clinic providing chiropractic treatments to individuals involved in automobile accidents.  It was incorporated on November 23, 2009 with its principal place of business at incorporation through the present being at 5690 Windhover Dr., Orlando, Florida 32819.

13.    Defendant Dr. Copeland is a citizen of Florida who, at all times relevant to this action, was a resident of Palm Beach County, Florida.  Dr. Copeland has purported to wholly own First Choice since January 2008, and has purported to wholly own International since its incorporation in November 2009.  Dr. Copeland purported to own the Clinics in an effort to conceal the identity of the true owners and allow the Clinics to evade the licensing requirements under Florida law for clinics owned by non-medical professionals.

14.    Faustin Belizor and Jean Harry Maurice have been the true owners of First Choice from its incorporation through the present.  Belizor and Maurice are not licensed health care practitioners and cannot own or operate an unlicensed clinic under Florida law. Belizor has also been the true owner of International from its incorporation through the present.

### The Health Care Clinic Act
### Florida Statutes §§ 400.990 *et seq.*

15.    In 2003, the Florida Legislature enacted the Clinic Act based on its finding that "the regulation of health care clinics must be strengthened to prevent significant cost

and harm to consumers." Fla. Stat. § 400.990(2) (2003). The Clinic Act's express purpose "is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by the Agency for Health Care Administration." *Id.*

### *Licensure Requirement*

16.     The Clinic Act requires each clinic location, with limited exceptions, obtain a license from Florida's Agency for Health Care Administration ("AHCA"). Fla. Stat. § 400.991(1) (2003); *see also* Fla. Stat. § 400.991(1)(a) (2011) (same requirement). This licensure requirement has remained a key feature of the Clinic Act since its enactment in 2003 through the present. Clinics that existed at the time of the Clinic Act's enactment were required to submit a license application to AHCA on or before March 1, 2004. *See* Fla. Stat. § 400.991(2) (2003).

17.     To obtain a health care clinic license, a clinic must submit to oversight by AHCA. AHCA conducts a clinic inspection to confirm various statutory and regulatory requirements are met and requires background checks on all clinic personnel involved in patient care. The clinic must provide certain information to AHCA, including: the services to be provided; the owners' names and contact information and percentage ownership; the board members' names and contact information; the names, contact information, and license information of all personnel who provide services to patients or who have access to patient funds; and proof of financial ability to operate. Further, a clinic must have a medical director and the medical director must sign the portion of the clinic licensure

application agreeing to accept legal responsibility for the activities specified in Florida Statutes § 400.9935. Applying for and obtaining a license is not a one-time obligation. Instead, because the Legislature intended for AHCA to have ongoing oversight, each health care clinic must re-apply for a license from AHCA every two years. *See* Fla. Stat. §§ 400.991(2), 400.9925(1) (2004); *see also* Fla. Stat. § 400.9925(1) (2011) (requiring "biennial renewal of licenses").

### *"Wholly Owned" Licensure Exemption*

18.    Certain types of health care clinics are not required to comply with the Clinic Act's licensure requirements. *See* Fla. Stat. § 400.9905(3) (2003) (defining "clinic"); *see also* Fla. Stat. § 400.9905(4) (2011) (defining "clinic").

19.    One type of clinic that is not required to obtain a license from AHCA is a clinic that is "wholly owned by a licensed health care practitioner, or the licensed health care practitioner and the spouse, parent, or child of a licensed health care practitioner, so long as one of the owners who is a licensed health care practitioner is supervising the services performed therein and is legally responsible for the entity's compliance with all federal and state laws." Fla. Stat. § 400.9905(3)(g) (2003); *see also* Fla. Stat. § 400.9905(4)(g) (2011) (definition of "clinic" substantially unchanged).

20.    For a clinic to qualify as "wholly owned" by a licensed health care practitioner, the health care practitioner must demonstrate actual ownership through the following non-exclusive factors:

> (a)    Ownership of the stock of a corporation and the exercise of corporate powers;

6

      (b)     The extent of any capital investment in the business;

      (c)     The right to profit from the business and the risk of loss;

      (d)     The power to sell the business or cause it to cease operations; and

      (e)     The extent to which an individual participates in the management and control of the business operations.

*See State Farm Fire & Cas. Co. v. Silver Star Health & Rehab Inc.*, 739 F. 3d 579, 585 (11th Cir. 2013).  None of these factors is more significant than the others.  *See id.*

21.    In addition, and as stated above, a clinic meets the "wholly owned" exemption *only if* "one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws."  In other words, a clinic does not qualify for the "wholly owned" exemption when a licensed health care practitioner fails to supervise the clinic's business activities or remain responsible for legal compliance, even if that health care practitioner purports to wholly own the health care clinic. *See* Fla. Stat. § 400.9905(4)(g).

### *Effect of Violations*

22.    Recognizing the importance of protecting patients' health and reducing health care fraud, the Legislature provided criminal penalties for violating the Clinic Act. "Any person who owns, operates, or maintains an unlicensed clinic commits a felony of the third degree, . . .  Each day of continued operation is  separate offense."  Fla. Stat. § 400.993(2) (2003).  This provision was subsequently amended to incorporate the Health Care Licensing Procedures Act, Florida Statutes §§ 408.801 *et seq*., following its enactment in 2006.  *See* Fla. Stat. § 400.993(1) (2007) (providing that "[a]ny person who

45937856;3

violates s. 408.812 regarding unlicensed activity commits a felony of the third degree, . . . Each day of continued operation is a separate offense.") The Health Care Licensing Procedures Act prohibits, among other things, offering services that require licensure to the public with obtaining a license from AHCA and owning, operating or maintaining an unlicensed provider. *See* Fla. Stat. § 408.812(1) and (3) (2006).

23.    In addition to providing for criminal penalties, the Legislature also declared "[a]ll charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed, or that is otherwise operating in violation of this part, are *unlawful charges*, and therefore are *noncompensable and unenforceable*." Fla. Stat. § 400.9935(4) (2003) (emphasis added); *see also* Fla. Stat. § 400.9935(3) (2011) (identical provision).

### Florida Motor Vehicle No-Fault Law
### Florida Statutes §§ 627.730 *et seq.*

24.    Florida Statutes §§ 627.730 through 627.7405 comprise the Florida Motor Vehicle No-Fault Law ("No-Fault Law"). *See* Fla. Stat. § 627.730 (2003). The purpose of the No-Fault Law is to provide medical, surgical, funeral, and disability insurance benefits without regard to who is at fault in an automobile accident and, as a prerequisite to registering a motor vehicle in Florida, to require motor vehicle insurance securing such benefits. Fla. Stat. § 627.731 (2003).

25.    Pursuant to the No-Fault Law, State Farm Mutual and State Farm Fire are obligated to provide up to $2,500 in personal injury protection ("PIP") benefits to their Florida insureds for whom they have issued automobile insurance policies or up to $10,000

for insured who are diagnosed with an emergency medical condition.[1]  *See* Fla. Stat. § 627.736(1) (2003) (specifying required benefits); Fla. Stat. § 627.736(1) (2011) (same).

26.    Individuals who are injured in a motor vehicle accident may seek reimbursement for "[e]ighty percent of all reasonable expenses for medically necessary medical, surgical, X-ray, dental, and rehabilitative services, . . ." up to a maximum of $2,500 or $10,000 in benefits.  Fla. Stat. § 627.736(1)(a) (2003); Fla. Stat. § 627.736(1)(a) (2011) (identical language).

27.    However, reimbursement shall be provided "only for such services and care that are *lawfully* provided, supervised, ordered, or prescribed by [certain enumerated licensed healthcare practitioners]."  Fla. Stat. § 627.736(1)(a) (2008) (emphasis added); *see also* Fla. Stat. § 627.736(1)(a) (2012) (providing that medical benefits reimbursements shall only be provided for "[i]nitial services and care that are lawfully provided, supervised, ordered, or prescribed by [certain licensed health care practitioners]").

28.    If a clinic fails to comply with Clinic Act's licensure requirements or otherwise qualify for an exemption from those requirements, then its services are not lawfully provided within the meaning of the No-Fault Law.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. B & A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, No. 14-cv-24387, 2015 WL 7272738, at *12 (S.D. Fla. Nov. 9, 2015) (granting State Farm Mutual's Motion for Summary Judgment and holding that a clinic's license was void *ab initio* where it was

---

[1] Effective January 1, 2013, patients must present with an emergency medical condition, appropriately reflected in the medical records, in order to qualify for $10,000.00 in No-Fault Benefits.  Prior to that time, every patient was entitled to up to $10,000.00 in No-Fault Benefits without an emergency medical condition determination.

obtained through false and misleading statements on licensing application pertaining to a medical director's duties).

## The Licensure Circumvention Scheme

29.     The significant obligations and limitations imposed by the Clinic Act and the Licensing Procedures Act on the ownership and operation of clinics caused some lay people to develop schemes to circumvent these legal requirements.

30.     Rather than submit to substantial oversight by AHCA by obtaining and maintaining a clinic license, some individuals enter into unlawful clinic "ownership" arrangements with a licensed health care practitioner to claim a licensure exemption. Under these clinic ownership arrangements, a licensed health care practitioner, such as a medical doctor or chiropractor, agrees to be held out to the public and AHCA as the sole paper owner of the clinic so the clinic can claim a licensure exemption on the basis that it is "wholly owned" by a health care practitioner when, in fact, the clinic is secretly owned by unlicensed laypersons who are responsible for operating the clinic and who receive most of the clinic's profits, sometimes through a "management fee", while the health care practitioner "owner" receives limited compensation, has little, if any, opportunity to share in the clinic's profits, and has limited, if any, operational control over the clinic.

31.     Such schemes enable unlicensed laypersons to unlawfully obtain substantial insurance payments from Plaintiffs and other insurance carriers while avoiding the oversight, protections, and obligations of Florida's health care clinic laws and regulations.

10

45937856;3

32.     This type of "[u]nlicensed activity constitutes harm that materially affects the health, safety, and welfare of clients," Florida Statutes § 408.812(2), and is precisely the type of misconduct Florida's health care clinic licensing laws were enacted to prevent.

33.     As detailed below, from January 1, 2008 through present, First Choice, Belizor, Maurice, and Dr. Copeland have misrepresented that Dr. Copeland was First Choice's "owner" when in fact she was not.  In fact, First Choice and Dr. Copeland have continuously held out that Dr. Copeland is the owner of First Choice since January 1, 2008, when in reality Belizor and Maurice, not Dr. Copeland, have at all times continued to own, operate, and control First Choice.

34.     From November 23, 2009 through present, International, Belizor, and Dr. Copeland have misrepresented that Dr. Copeland was International's "owner," when in fact she was not.  Instead, Belizor – not Dr. Copeland – has at all times continued to own, operate, and control International.

**First Choice And International Do Not Qualify for the "Wholly Owned" Exemption Because Dr. Copeland Never Owned the Clinics**

*First Choice Continues to Be Owned and Operated by Maurice and Belizor*

35.     From January 1, 2008 through present, First Choice, Belizor, Maurice, and Dr. Copeland have misrepresented that Dr. Copeland was the sole owner of First Choice. But, Dr. Copeland does not own and has never owned, in whole or in part, First Choice and, therefore, the clinic is not entitled to any licensure exemption based on her purported "ownership."

11

45937856;3

36.     On September 20, 2006, Belizor and Maurice formed First Choice. Maurice, a layperson, was identified as the incorporator and Belizor, a layperson, was identified as the registered agent.  First Choice has never registered with, and never sought a health care clinic license or exemption from AHCA.

37.     On October 11, 2007, the Florida Legislature signed a new No-Fault law governing Personal Injury Protection benefits, which became effective January 1, 2008, as well as amendments to the Act governing Chiropractic Medicine.  *See* § 460.4167, Florida Statutes.  The amendment required that a clinic be licensed under the Clinic Act or be "wholly owned" by a Medical Doctor, licensed Chiropractor, or other expressly defined medical practitioner to bill for and be reimbursed under a patient's Personal Injury Protection benefits.  *See* §627.736, Florida Statutes (Florida's "No-Fault Law"); *see also* Fla. Stat. §460.4167(1) ("A person may not employ a chiropractic physician licensed under this chapter…unless the entity is wholly owned…")

38.     The amendment to the Clinic Act became effective January 1, 2008.  As a result, effective January 1, 2008, First Choice could no longer be owned and operated by laypersons Maurice or Belizor without obtaining a license.

39.     On January 15, 2008, First Choice filed Amendments to its Articles of Incorporation for First Choice with Florida's Department of State, Division of Corporations (the "Amended Articles").  A copy of the Amended Articles are attached as **Exhibit 1**.  Maurice executed the Amended Articles as First Choice's President and identified Dr. Copeland as the new director.

45937856;3

40.    Dr. Copeland resided (and continues to reside) at least 160 miles from the clinic in Palm Beach County, Florida.

41.    The Amended Articles identified Dr. Copeland as the sole director of First Choice, effective December 27, 2007 (just four days before the effective date of the law). The Amended Articles, identify the new director as "Diana" Copeland—which is clearly a misspelling of Dr. Copeland's name.  The Amended Articles also indicate Belizor would remain the Registered Agent for First Choice.

42.    First Choice's Annual Reports for 2008 and 2009 similarly misspelled Dr. Copeland's name as "Diana" Copeland.  *See* Annual Reports, copies attached as Composite **Exhibit 2**.  Even more troubling, the Annual Report filed on May 2, 2008, five months after the purported ownership change, was signed by Belizor despite him having purportedly sold the clinic to Dr. Copeland on December 27, 2007.  *Id.*

43.    The new filings were part of the scheme to circumvent the Clinic Act's obligations and to conceal the true (and continued) ownership of First Choice by laypersons Belizor and Maurice.  In fact, Dr. Copeland was the second physician Maurice and Belizor approached and considered to serve as the straw owner of the clinic.  Initially, Maurice and Belizor approached Dr. Judith McKenzie[2] in 2007 and asked her to serve as the purported owner of First Choice due to the 2007 change in the law.  Dr. Copeland testified Dr.

---

[2] Dr. Judith McKenzie has been involved in similar unlawful clinic ownership arrangements and legal actions concerning those relationships in the Past.  *See State Farm Fire & Casualty Company v. Silver Star Health and Rehab, Judith McKenzie & Jean Colin*, 739 F.3d 579 (11th Cir. 2013).  In *Silver Star*, State Farm Fire filed a lawsuit against Silver Star (a chiropractic clinic) and, among others, Dr. Judith McKenzie.  Like Dr. Copeland, Dr. McKenzie was a chiropractor and purported "owner" of the clinic Silver Star.  After a jury returned a verdict in favor of State Farm Fire and Silver Star appealed, the *Silver Star* court affirmed the jury verdict finding that Silver Star was not wholly owned by Dr. McKenzie, and thus, the clinic's bills were non-compensable.

45937856;3

McKenzie was unable to do so, and thus it was "arranged" for Dr. Copeland to "take over the clinic." However, Dr. McKenzie remained as the doctor at the clinic until Dr. Copeland assumed the role of treating physician.

44.    Maurice and Belizor never relinquished control or ownership of First Choice to Dr. Copeland, but simply began to misrepresent (and continue to misrepresent) Dr. Copeland was the new owner of First Choice to avoid the Clinic Act's licensing requirements.

45.    Moreover, on January 14, 2008, one day before filing the Amended Articles identifying Dr. Copeland as the new director of First Choice, Belizor and Maurice opened a new entity titled B&M Med Management, LLC.

46.    Despite purportedly divesting all ownership interest in First Choice, Belizor remains its registered agent, continues to distribute checks to the clinic's employees, continues to control the daily operations at First Choice, continues to be responsible for the hiring and firing of employees at First Choice, and even attended a First Choice Christmas party. Belizor's wife, Carole Antoine, served and continues to serve as First Choice's office manager, controlling its day to day operations along with Belizor.

*International is Owned and Operated by Belizor*

47.    On December 29, 2008, Conroy Chiropractic Clinic, Inc. ("Conroy") located at 5690 Windhover Drive in Orlando, Florida was formed by filing Articles of Incorporation with Florida's Division of Corporations which identified Dr. Copeland as the incorporator, sole officer and Registered Agent. However, Dr. Copeland has testified

45937856;3

there are no corporate formation documents, including no Articles, no By-Laws and no Stock Certificates relevant to the formation of or ownership of Conroy.

48.     Dr. Copeland resided (and continues to reside) at least 160 miles from the clinic in Palm Beach County, Florida.

49.     On November 23, 2009, International was formed by the filing of its Articles of Incorporation with Florida's Division of Corporations.  International's initial Articles of Incorporation identified Dr. Copeland as the incorporator, sole officer, and Registered Agent.  International was and continues to be located at the same principal place of business as Conroy.  Like First Choice, neither Conroy nor International sought a license or applied for an exemption from licensure with AHCA.

50.     While not named as a corporate officer or director at International, Belizor was identified as the purported Assistant Manager and submitted a Pain Management Clinic Affidavit in that capacity on behalf of International to the Orange County Tax Appraiser.  *See* Business Tax Pain Management Clinic Affidavit, attached as **Exhibit 3**. The Pain Management Clinic Affidavit is required by Orange County to be filed by Pain Management Clinics.

51.     Belizor's involvement at International was so prominent (and Dr. Copeland's so minimal) that employees identified Belizor as the owner of International.

### *Dr. Copeland's Declarations Belie Any Ownership Interest in First Choice or International*

52.     On December 22, 2009, one year after Dr. Copeland purportedly assumed ownership of First Choice and Conroy, Dr. Copeland filed for Chapter 13 Bankruptcy in

45937856;3

West Palm Beach, Florida.  Dr. Copeland's own declarations to the Court reveal she is not the owner of First Choice or International (or Conroy).

53.    On January 5, 2010, Dr. Copeland filed a Statement of Financial Affairs, declaring under oath, that she did not own (5% or more), or serve as an officer or director for, ***any business entities*** within the previous six years.  *See* Statement of Financial Affairs, attached as **Exhibit 4** at pp. 7-8.

54.    Dr. Copeland also filed a schedule identifying all assets and liabilities, and declared under the penalty of perjury, that she owned no "interests in incorporated or unincorporated businesses," that she or her businesses had no accounts receivable, and that she owned no office equipment, furnishings and/or supplies.  *See* Schedules of assets and liabilities at pp. 5-7, attached as **Exhibit 5.**

55.    Employees and medical professionals at First Choice and International have also identified Belizor and/or Maurice as the true owners of First Choice and Belizor as the true owner of International, not Dr. Copeland.

56.    For example, Tammy Tadom, M.D. ("Dr. Tadom") worked as an Independent Contractor at both First Choice and International in 2012 and was employed to provide Emergency Medical Condition ("EMC") exams at these clinics.[3]

---

[3] Florida's No-Fault Law provides for maximum PIP benefits of $2,500 for each insured; however, if the insured is diagnosed with an Emergency Medical Condition, the law provides for a maximum benefit increase to $10,000 per insured, per accident.  Thus, clinics which focus on providing treatment to patients injured in motor vehicle accidents, often have a doctor whom solely or primarily provides EMC diagnoses or determinations in order to unlock additional PIP benefits.

45937856;3

57.     In 2012, a woman named Sandra Nordblom ("Nordblom") from Equitable Services, LLC[4] approached Dr. Tadom, on behalf of Belizor, about becoming the official owner of First Choice and International.

58.     According to Nordblom, Belizor wanted a medical doctor instead of a chiropractor to be listed on the corporate paperwork as the straw owner of the two clinics.

59.     Nordblom advised Dr. Tadom regarding the mechanics of the scheme and how it would operate: Dr. Tadom would serve as the purported "owner" and Belizor and Maurice would maintain control of the clinic and its profits.

60.     Nordblom further advised Dr. Tadom that Nordblom would facilitate a meeting between Nordblom, Belizor, and Dr. Tadom, but the meeting never materialized.

61.     In May 2012, however, following Dr. Tadom's meeting with Nordblom and without Dr. Tadom's knowledge or consent, two clinics – Choice Medical Rehabilitation Center, LLC ("Choice Medical") and Prestige Medical Rehabilitation Center, LLC ("Prestige Medical") – were opened and documents were submitted to the Florida Department of State that fraudulently identified Dr. Tadom as the incorporator and officer of these entities.  *See* Articles of Incorporation, attached hereto as Composite **Exhibit 6**.

62.     In fact, Dr. Tadom's name and information were used without her consent and her electronic signature affixed without her knowledge.

---

[4] Equitable Services holds itself out as a medical billing and consulting company and has been in continuous operation in Orlando, Florida since 2006.

45937856;3

63.     The documents submitted to the Department of State for Choice Medical and Prestige Medical identified the exact same addresses as First Choice (Choice Medical) and International (Prestige Medical) for principal places of business.

64.     Dr. Tadom did not have any ownership interest in or knowledge regarding Choice Medical or Prestige Medical, and she never provided permission to use her name on the corporate records.  Additionally, Dr. Tadom did not have a P.O. Box and has no knowledge of the P.O. Box utilized as the mailing address in the Articles of Organization for Prestige.

65.     According to Dr. Tadom, Belizor was and remains the actual owner of First Choice and International, not Dr. Copeland.

66.     Dr. Tadom, despite having worked at the clinic for approximately one year, never met Dr. Copeland.

### First Choice and International Did Not and Does Not Qualify for the "Wholly Owned" Exemption Because Dr. Copeland Never Owned the Clinic

67.     Dr. Copeland was not and is not the true owner of First Choice or International.  During all relevant times, Belizor and Maurice actually owned, operated, and controlled First Choice and Belizor actually owned, operated, and controlled International.

68.     As a result, First Choice and International did not qualify for an exemption under the Clinic Act at any time and were required to obtain a license from AHCA and appoint a medical director to fulfill the requirements set forth in Florida Statutes § 400.9935 and to oversee the day-to-day operation of the clinic.

45937856;3

69.     Neither First Choice nor International satisfied these requirements as neither obtained a license from AHCA, nor did either clinic appoint a medical director to fulfill the requisite duties needed to operate lawfully.

70.     From January 1, 2008 through the present, Dr. Copeland, Maurice, and Belizor have been essential participants in the scheme to avoid obtaining a health care clinic license for First Choice and to evade the oversight of both AHCA and a proper medical director.  Without Dr. Copeland's willingness to serve as a straw owner, First Choice and International (and Belizor and Maurice) could not have carried out the scheme.

71.     From November 23, 2009 through the present, Dr. Copeland and Belizor have been essential participants in the scheme to avoid obtaining a health care clinic license for International and to evade the oversight of both AHCA and a proper medical director. Without Dr. Copeland's willingness to serve as a straw owner, International (and Belizor) could not have carried out the scheme.

**First Choice and International's Services Were Not Lawful Under Florida Law**

72.     At all relevant times, neither First Choice nor International satisfied the requirements of the wholly-owned licensure exemption because they were not "wholly owned" by Dr. Copeland, but rather were actually owned, operated, and controlled by laypersons Belizor and Maurice.

73.     Accordingly, from January 1, 2008 through the present, First Choice operated unlawfully, without a valid license and without a valid licensure exemption in violation of Florida law.

19

45937856;3

74.     From its inception on November 23, 2009 through the present, International operated unlawfully, without a valid license and without a valid licensure exemption in violation of Florida law.

75.     Under the Clinic Act, "[a]ll charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed, or that is otherwise operating in violation of this part, are unlawful charges, and therefore are noncompensable and unenforceable." Fla. Stat. § 400.9935(4) (2004).[5]

76.     In addition, under Florida's No-Fault Law, reimbursement shall be provided "only for such services and care that are *lawfully* provided, supervised, ordered, or prescribed . . ." Fla. Stat. § 627.736(1)(a) (2008) (emphasis added); *see also* Fla. Stat. § 627.736(1)(a)(1) (2012) (providing for reimbursement for "[i]nitial services and care that are lawfully provided, supervised, ordered, or prescribed . . .").[6]

77.     All services rendered by the Clinics to State Farm insureds during these time periods were unlawful and noncompensable.

78.     As part of its unlawful license circumvention scheme, First Choice and International submitted, or caused to be submitted, claims for payment to State Farm Mutual and State Farm Fire. *See* Date of Service Summary, attached as **Exhibit 7**.

79.     Based on First Choice's and International's submission of claims to Plaintiffs, between February 11, 2016 and February 11, 2020, State Farm Mutual paid First

---

[5] In the 2007 amendments, this provision moved to Florida Statutes § 400.9935(3) (2007), where it has remained substantially unchanged since 2007.

[6] The "lawfully provided" language was added to the No-Fault Law in 2008.

45937856;3

Choice more than $537,000 and paid International more than $80,000. Plaintiff State Farm Fire paid First Choice more than $71,000 and paid International more than $47,000. *See* First Choice Damages and International Damages, attached as **Exhibit 8**.

80.    A list of the claims, the amounts billed, the amounts paid by State Farm Mutual and State Farm Fire to First Choice and International, and any amounts remaining unpaid for this period are attached as **Exhibit 8**.

81.    Plaintiffs are entitled to recover all amounts they paid to First Choice and International as set forth in **Exhibits 8**. *See also* Exhibit 7.

82.    Plaintiffs are also entitled to a declaratory judgment confirming that they are not obligated to pay for any services or for any of the amounts First Choice or International provided and billed to the State Farm Plaintiffs which the State Farm Plaintiffs denied, underpaid, or which remain outstanding as set forth in **Exhibits 8**.

83.    First Choice, International, Dr. Copeland, Belizor, and Maurice concealed their unlawful scheme from Plaintiffs by filing misleading documents with the Florida Secretary of State, making false statements under oath regarding ownership of First Choice and International, and submitting insurance claim forms to State Farm Mutual and State Farm Fire for payment of PIP benefits claiming that First Choice and International's services were lawfully rendered and not fraudulent, when this was not true. An exemplar of the insurance claim form submitted to Plaintiffs is attached as Composite **Exhibit 9**.

84.     Plaintiffs did not know and should not have known that First Choice and International were not, in fact, owned by Dr. Copeland until Dr. Tadom stated in her affidavit that they were not owned by Dr. Copeland.

85.     First Choice, International, Dr. Copeland, Belizor and Maurice misrepresented and intentionally concealed the ownership of First Choice and International in an attempt to evade the licensure requirements of the Clinic Act and oversight of AHCA.

## FIRST CLAIM FOR RELIEF
**(Unjust Enrichment Against First Choice, Belizor, Maurice and Diane Copeland, D.C.)**

86.     Plaintiffs incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 85 above.

87.     Plaintiffs conferred benefits on First Choice, Belizor, Maurice, and Dr. Copeland by making payments to First Choice and Dr. Copeland for services rendered from February 11, 2016 through the present in the amounts listed in **Exhibit 8**. *See also* **Exhibit 7**.

88.     First Choice, Maurice, Belizor, and Dr. Copeland were aware of, voluntarily accepted, and retained Plaintiffs' payments.

89.     First Choice was aware of, voluntarily accepted, and retained Plaintiffs' payments to First Choice.

90.     As the owners of and essential participants in the scheme, Belizor and Maurice benefited from the State Farm Plaintiffs' payments to First Choice.  Belizor and Maurice were aware of, voluntarily accepted, and retained the benefit of the State Farm Plaintiffs' payments to First Choice.

45937856;3

91.     As the straw owner and an essential participant in the scheme, Dr. Copeland benefitted from the State Farm Plaintiffs' payments.  Dr. Copeland was aware of, voluntarily accepted, and retained the benefit of the State Farm Plaintiffs' payments to First Choice.

92.     First Choice, Dr. Copeland, Belizor, and Maurice are jointly and severally liable for the unlawful operation of First Choice because they were essential participants in the unlawful scheme.  But for Dr. Copeland's willingness to serve as a straw owner of First Choice, the clinic would have had to obtain a clinic license and submit to substantial oversight from AHCA.

93.     First Choice's, Dr. Copeland's, Belizor's, and Maurice's retention of the State Farm Plaintiffs' payments was and is wrongful because the payments were for lawfully-provided health care services when, in fact, First Choice's services were not lawful and the clinic operated in violation of Florida law.

94.     It would be unjust under the circumstances alleged in this complaint to allow First Choice, Belizor, Maurice, and Dr. Copeland to continue to retain the benefits conferred on them by Plaintiffs.

WHEREFORE, the State Farm Plaintiffs respectfully request this Court to enter judgment in their favor and award damages, interest, and costs against First Choice, Belizor, Maurice, and Dr. Copeland, jointly and severally, in an amount to be proven at trial, and grant such other relief as the Court deems just and appropriate.

45937856;3

**SECOND CLAIM FOR RELIEF**

**(Unjust Enrichment Against International, Belizor and Diane Copeland, D.C.)**

95.    Plaintiffs incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 85.

96.    Plaintiffs conferred a benefit on International, Belizor, and Dr. Copeland by making payments to International for services rendered from February 11, 2016 through the present in the amounts listed in **Exhibits 7 & 8**.

97.    International was aware of, voluntarily accepted, and retained Plaintiffs' payments to International.

98.    As the owner of and essential participant in the scheme, Belizor benefited from the State Farm Plaintiffs' payments to International.   Belizor was aware of, voluntarily accepted, and retained the benefit of the State Farm Plaintiffs' payments to International.

99.    As the straw owner and an essential participant in the scheme, Dr. Copeland benefitted from the State Farm Plaintiffs' payments.   Dr. Copeland was aware of, voluntarily accepted, and retained the benefit of the State Farm Plaintiffs' payments to International.

100.    International, Dr. Copeland, and Belizor are jointly and severally liable for the unlawful operation of International because they were essential participants in the unlawful scheme.   But for Dr. Copeland's willingness to serve as a straw owner of International, International would have been required to obtain a clinic license and submit to substantial oversight from AHCA.

45937856;3

101.    International's, Belizor's, and Dr. Copeland's retention of the State Farm Plaintiffs' payments was and is wrongful and inequitable because the payments were for lawfully-provided health care services when, in fact, International's services were not lawful and the clinic operated in violation of Florida law.

102.    It would be unjust under the circumstances alleged in this complaint to allow International, Belizor, and Dr. Copeland to continue to retain the benefits conferred on them by the State Farm Plaintiffs.

WHEREFORE, the State Farm Plaintiffs respectfully request this Court to enter judgment in their favor and award damages, interest, and costs against International, Belizor, and Dr. Copeland, jointly and severally, in an amount to be proven at trial, and grant such other relief as the Court deems just and appropriate.

## THIRD CLAIM FOR RELIEF
**(Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against First Choice)**

103.    Plaintiffs incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 85.

104.    First Choice submitted bills to the State Farm Plaintiffs for services that First Choice purportedly lawfully provided to the State Farm Plaintiffs' insureds.

105.    As detailed herein, First Choice engaged in an unlawful licensure circumvention scheme designed to deceive and mislead both AHCA and insurers like State Farm Mutual and State Farm Fire.  First Choice never qualified for the "wholly owned" exemption from licensure and, consequently, should have obtained and maintained a valid health care clinic license, which it failed to do.

45937856;3

106.    As a result of First Choice's illegal operation from on or before February 11, 2016 through the present, all of the services for which First Choice submitted bills to the State Farm Plaintiffs were unlawful under Florida law (Florida Statutes §§ 400.9935 and 627.736).  Accordingly, First Choice is not entitled to payment for any services it billed to the State Farm Plaintiffs during the relevant time period, but which remain outstanding, remain unpaid entirely, or that were underpaid.

107.    Thus, there is an actual case and controversy between the State Farm Plaintiffs and First Choice as to bills submitted by First Choice to the State Farm Plaintiffs that have not been paid (whether in whole or in part) which are identified in **Exhibits 7 and 8**.

WHEREFORE, the State Farm Plaintiffs seek a judgment declaring they are not obligated to pay any unpaid amounts of First Choice's charges for services provided from February 11, 2016 through present and granting such other and further relief this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against International)

108.    Plaintiffs incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 85.

109.    International submitted bills to Plaintiffs for services that International purportedly lawfully provided to the State Farm Plaintiffs' insureds.

110.    As detailed herein, International engaged in an unlawful licensure circumvention scheme designed to deceive and mislead both AHCA and insurers like the

45937856;3

State Farm Plaintiffs. International never qualified for the "wholly owned" exemption from licensure and, consequently, should have obtained and maintained a valid health care clinic license, which it failed to do.

111.    As a result of International's illegal operation from on or before February 11, 2016 through the present, all of the services for which International submitted bills to the State Farm Plaintiffs were unlawful under Florida law (Florida Statutes §§ 400.9935 and 627.736). Accordingly, International is not entitled to payment for any services it billed to the State Farm Plaintiffs during the relevant time period, but which remain outstanding, remain unpaid entirely, or that were underpaid.

112.    Thus, there is an actual case and controversy between the State Farm Plaintiffs and International as to bills submitted by International to the State Farm Plaintiffs that have not been paid (whether in whole or in part), which are identified in **Exhibits 7 and 8**.

WHEREFORE, the State Farm Plaintiffs seek a judgment declaring they are not obligated to pay any unpaid amounts of International's charges for services provided from February 11, 2016 through present and  granting such other and further relief this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury of all issues so triable.

Dated: February 11, 2020.

By: */s/ David Spector*
    David I. Spector, **Trial Counsel**
    Florida Bar Identification No. 086540
    Nicholas J. Purvis
    Florida Bar Identification No. 054268
    **HOLLAND & KNIGHT LLP**
    777 South Flagler Drive, Suite 1900W
    West Palm Beach, FL 33401
    Telephone:  (561) 833-2000
    Facsimile:   (561) 650-8399
    E-mail: david.spector@hklaw.com
           nicholas.purvis@hklaw.com
           kim.roark@hklaw.com
           alexandra.amburgy@hklaw.com
    *Attorneys for State Farm Plaintiffs*

45937856;3